**COMPUTER NETWORK, LTD., a Missouri Corporation, Plaintiff–Respondent,**

**v.**

**PURCELL TIRE & RUBBER COMPANY, a Missouri Corporation, Defendant–Appellant.**

**No. 53152.**

Missouri Court of Appeals,
Eastern District,
Division Five.

March 1, 1988.

Maurice B. Graham, Daniel Patrick Fall, Fredericktown, for defendant-appellant.

Eric Charles Harris, Flat River, for plaintiff-respondent.

SIMEONE, Senior Judge.

## I.

This is an appeal by defendant-appellant, Purcell Tire & Rubber Company from a judgment entered by the circuit court of St. Francois County which awarded damages to plaintiff-respondent, Computer Network, Ltd., for breach of contract involving the sale of personal computers by Computer Network to defendant, Purcell. Purcell denies that a "contract" was ever intended or entered into by the parties for a definite, certain number of computers, contrary to the findings and judgment of the trial court.

The sole issues on this appeal are whether there was a contract for the sale to Purcell of twenty-one IBM personal computers and whether the contract was sufficiently definite so as to be legally enforceable so as to afford a reasonably certain basis for awarding damages. We hold, as did the trial court, that there was a definite contract entered into by the parties and affirm.

## II.

Appellant, Purcell Tire & Rubber Company is engaged in the business of the sale and distribution of motor vehicle tires. In early 1984, it had 14 or 15 stores located in Missouri and several other states. There were four located in Missouri. Robert G. Purcell is the president and chief executive officer of the company. Harry F. Chapman is its comptroller.

In 1983 and 1984, Computer Network, Ltd. engaged in the general business of selling and developing computer hardware and software. It obtained hardware from "several sources," including IBM. In this regard, Computer acted as a broker in purchasing from IBM and other companies. Curtis Lloyd Brown was the president of Computer Network. In the fall of 1983 and early 1984, Brown and certain personnel of Purcell, including Chapman, entered into discussions concerning the possibility of selling and purchasing personal computers. In December, 1983, Brown entered into discussions with the data processing manager for Purcell and "helped them develop a configuration of IBM Personal Computers to go to their retail stores." Thereafter Brown "entered into discussions with Harry Chapman to arrive at the exact price and number of computers to be sold to them."

After these discussions were held and on February 23, 1984, Brown prepared a letter, took it to Chapman at Purcell and Chapman signed it. Brown gave him a copy. The letter read as follows:

February 23, 1984

Mr. Harry Chapman

Purcell Tire Company

P.O. Box 100

Potosi, Missouri 63664

Dear Harry,

Please let this letter serve as written confirmation of our previous conversations regarding the purchase by Purcell Tire of twenty-one (21) IBM PC's over the next twelve (12) months.

The configuration of the systems you are to purchase are as follows:

| | |
|---|---:|
| IBM PC 256K—One Diskette Drive | $2,454.00 |
| Monochrome Display & Printer Adapter | 335.00 |
| Monochrome Display | 345.00 |
| 10 MG Disk Drive | 1,450.00 |
| Hayes Smart Modem 1200B w/SmartCom II | 599.00 |
| Okidata Printer 92P w/Cable | 649.00 |
| IBM D.O.S. 2.1 | 65.00 |
| | $5,897.00 |
| Less 10% Discount | (589.70) |
| | $5,307.30 |

As per our understanding, we have placed two machines on order for immediate delivery.

If this is in accordance with your understanding, please sign the enclosed copy of this letter and return. If this is not in accordance with your understanding, please let me know as soon as possible.

Sincerely,

/s/ Curtis L. Brown

Curtis L. Brown, President

Signature /s/ Harry Chapman

Date 2/24/84

CLB:skj

In March, 1984, two units were delivered to Purcell and paid for promptly. Over the next few months, seven other units were delivered and paid for. The prices of these seven differed from the price in the letter and did not conform exactly to the price stated in the letter for each unit. The prices ranged from $4,705.20 to $5,667.30. The differences, as explained by Brown, were that prices of printers differed, and the prices "dropped" so Computer decreased the price so as to maintain approximately a $2,000 profit. The last of the nine units was delivered and paid for in December, 1984. No further deliveries were made and no further units were paid for.

Sometime after February, 1985, after the expiration of the "agreement," Brown telephoned Chapman concerning the delivery of the remaining twelve computers and "he said that we had no such agreement, so we sent him a copy of the agreement [letter], showing him."

On September 27, 1985, Computer Network filed its petition for damages for breach of contract. It alleged that the parties "entered into a written contract regarding the sale of twenty-one (21) IBM Personal Computers" and that Purcell "breached the Agreement by not purchasing the additional twelve (12) units." Computer prayed for $25,515.60 in damages.

Purcell answered denying that it had entered into a contract to purchase the twenty-one computers, and asserted that "there never was a contract, as indicated by the letter," but "there had only been conversations regarding the possible transaction."

On January 30, 1987, the cause was heard by the trial court on a change of venue. At the hearing, Brown testified as to the facts stated above and testified that the letter was the "final and complete expression of [the] agreement." He testified that Purcell did not request the additional twelve units, that Computer Network was making a profit of $2,008.30 per unit and that it lost profits of $24,099.60.

On cross-examination, Brown was asked whether he had indicated to Chapman that "you [Brown] needed some sort of indication from him [Chapman] on how many they [Purcell] might consider purchasing." Objection was made by Computer's counsel on the ground of the parol evidence rule, but the court overruled the objection and permitted Brown to testify as to previous conversations that he did not indicate to Chapman that he needed such an indication to assist Computer in "getting" a "relationship with IBM." When questioned as to whether he knew how many stores Purcell had, Brown answered "I assumed they had 20, but I'm not truly aware of that." Brown clearly remembered a conversation with Chapman that the purchase of the computers would be based on "one at the home office and one for stores that they had at that time" and that the purchase was "directly related to the number of stores they had." As to the time of delivery, Brown testified that it was "our" understanding that Purcell "would let us know when they wanted the machines."

Mr. Chapman testified that he had had conversations with Brown about the "need for some personal computers," that Purcell had 14 or 15 stores and he admitted that he signed the February 23 letter. He was questioned as to his understanding of the meaning of the phrase near the end of the letter—"If this is in accordance with your understanding, please sign below." An objection was made on the ground that this would change the "terms of the document." The objection was overruled and Chapman testified as to the conversations he had with Brown prior to signing the letter. As to the conversations Chapman had with Brown concerning the number of units, Chapman stated that he did not "recall at all how the number 21 got in there. That was a figure that Mr. Brown had in the letter when he brought it over to me. I did not discuss, as well as I remember, the figure 21 with him." Chapman testified that in the discussions with Brown, he "never agreed to purchase a total of 21 personal computers," and that "my conversations were not to purchase a certain number of equipment. Mine was to verify with him a price and equipment configuration

based upon orders to be given to him by other people."

On cross-examination, Chapman denied ever placing an order for twenty-one computers, but did admit that he signed the letter and had the "ability" to make changes in it if he desired.

Following the hearing, and on March 30, 1987, the trial court found the issues in favor of Computer Network and entered judgment for $24,099.60 plus interest.

Purcell appealed. On appeal, Purcell contends that the trial court erred in concluding that there was a legally binding "contract" because the court failed to consider (1) the surrounding circumstances and facts that demonstrated a lack of mutual assent and intent to form a contract; (2) the parties' "previous conversations" and Chapman's lack of intent to contract; (3) the "ambiguity and incompleteness of the letter,"; and (4) the parties' "practical construction" of the letter.

Purcell argues that the parties only agreed to potentially purchase one computer for each retail store and for the home office, and that it never had 21 stores. It contends that parol evidence is admissible to determine whether a contract was made, and that the letter is so incomplete and indefinite so that no contract was formed.[1] Finally, Purcell contends that the court did not take into consideration the "practical construction" of the letter by the acts, declarations and conduct of the parties.

In this court-tried case, our review is governed by certain, well-known principles which proscribe appellate review: (1) we are required to sustain the judgment of the trial court unless the judgment is not supported by substantial evidence, unless it is against the weight of the evidence or unless it erroneously declares or applies the law, *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); (2) in conducting our review we do not judge the credibility of the witnesses; that task properly and exclusively rests with the trial court, *Sedmak v. Charlie's Chevrolet, Inc.*, 622 S.W.2d 694, 695 (Mo.App.1981); *Lillo v. Thee*, 676 S.W. 2d 77, 78 (Mo.App.1984); (3) in a court-tried case, the court is the ultimate trier of the facts, *Staab v. Thoreson*, 579 S.W.2d 414, 418 (Mo.App.1979); (4) as the trier of fact, the court may disbelieve and reject any portion of the testimony, *Gover v. Empire Bank*, 574 S.W.2d 464, 469 (Mo.App.1979); and (5) the fact that there is evidence or testimony in the record which may have supported a different conclusion does not demonstrate that the judgment of the court is contrary to the weight of the evidence. *Stegemann v. Fauk*, 571 S.W.2d 697, 700 (Mo.App.1978).

### IV.

A resolution of the issues requires adherence to the time-tested principles of common law and the various provisions of Missouri's Uniform Commercial Code relating to the sale of goods. Sections 400.2–101— 400.2–725, R.S.Mo., 1986. We deal here with the sale of "goods" as defined in § 400.2–105(1). We also deal with various principles of the common law of contracts which have not been displaced by the Code. Section 400.1–103.

Under the Uniform Commercial Code, "a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Section 400.2–204(1). The Code defines "contract" as the "total legal obligation which results from the parties' agreement as affected by the code and any other applicable rules of law." Section 400.1–201(11). An "agreement" "means

---

1. Purcell argues that the letter did not contain the following:
   1. A total price of $111,453.30 but only referred to 21 computers at $5,307.30 each.
   2. Which party was required to deliver the computers.
   3. A provision relating to the fluctuation in the price of the computers.
   4. A provision to alter the configurations.

5. A reference to the capacity of Harry Chapman.
6. A reference to Chapman's authority.
7. Any reference to the purpose of Purcell's purchase.
8. Any reference to liquidated damages relative to parties' breach.
9. Any reference that either party availed itself of legal counsel.

the bargain of the parties in fact as found in their language or by implication from the circumstances including course of dealing or usage of trade or course of performance...." Section 400.1–201(3). The provisions of the Code are to be liberally construed. Article Two expands the traditional concept of a contract and imposes new and wider ranges of obligation. J. White and R. Summers, *Uniform Commercial Code*, § 1–1 at 23–24 (1980). In keeping with this liberal trend, the Official Comment to the Code, Section 2–204, states that if the parties intend to enter into a binding agreement and an appropriate remedy may be fashioned, a contract for sale does not fail despite missing terms, if there is any reasonably certain basis for granting a remedy. The Code, however, will not imply an agreement if the parties did not reach or intend one. Section 2–204 requires an agreement between the negotiating parties. But the Code focuses upon "mutuality of assent as manifested by the conduct of the parties" in place of the 19th century's subjective test of intent. See *American Web Press, Inc. v. Harris Corp.*, 596 F.Supp. 1089, 1091–1092 (D.Colo.1983); *Euclid Engineering Corp. v. Illinois Power Co.*, 79 Ill.App.2d 145, 223 N.E.2d 409, 413 (1967).

While Section 2–204 provides that a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract, this section continues the common-law principle that the intent of the parties to make a contract must be manifested. The basic philosophy of this article is simple.

> Practical business people cannot be expected to govern their actions with reference to nice legal formalisms. Thus, when there is basic agreement, ... failure to articulate that agreement in the precise language of a lawyer with every difficulty and contingency considered and resolved, will not prevent formation of a contract."

*Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 395 N.Y.S.2d 151, 363 N.E.2d 701 (1977) quoted in 2 R. Anderson, *Uniform Commercial Code*, § 2–204:4 at 201 (1982).

## V.

■ The core issue here, under the evidence, is whether the parties intended a legally binding contract to arise from the February 23, letter. If the parties intended no binding agreement or contract, the rules of construction and interpretation will not establish one. If no intent is found, the inquiry is put to an end. If the expressions in the agreement are clear, the court determines the intent from a reading of the writing. If the intent is not clearly expressed, then surrounding circumstances may be considered—the subsequent actions of the parties and the practical construction of the contract. But the question whether there is an "intent to contract" is a question of fact to be determined by the trier of fact. See *Bethlehem Steel Corp. v. Litton Industries, Inc.*, 321 Pa.Super. 357, 468 A.2d 748, 751 (1983). Under UCC 2–204(1), in order to determine whether there is an enforceable contract, the court must find that the circumstances, including conduct, are sufficient to show agreement. The formation of a contract does not require that all terms be settled. One or more of the terms may be left open and the agreement will not fail for indefiniteness; but the parties must intend to make a contract. *D.R. Curtis Co. v. Mason*, 103 Idaho 476, 649 P.2d 1232, 1234 (App.1982); *Carolina Builders Corp. v. Howard–Veasey*, 72 N.C. App. 224, 324 S.E.2d 626, 629 (1985). If the parties act in a way which recognizes the existence of a contract, one may exist even though the writing does not otherwise establish a contract. "Sellers usually do not ship and buyers do not receive goods unless they think they have struck a deal." *Quaker State Mushroom v. Dominick's Finer Foods*, 635 F.Supp. 1281, 1285 (N.D. Ill.1986).

■ Courts do not favor the destruction of agreements, but will, if feasible, construe agreements so as to carry into effect the reasonable intention of the parties. *Mag Constr. Co. v. McLean County*, 181 N.W.2d 718, 721 (N.D.1970); J. Calamari & J. Perillo, *Contracts*, § 2–13 at 44 (2nd ed. 1977).

The main thrust of the appellant's contention is that the trial court failed to consider that there was no "mutual assent" and that Harry Chapman did not "intend" to enter into a binding agreement for the purchase of twenty-one computers. But the trial court held otherwise, and recognized that there was mutual assent.

The essential elements of an enforceable contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement and obligation. *Bengimina v. Allen*, 375 S.W.2d 199, 202 (Mo.App.1964); 2 R. Anderson, *Uniform Commercial Code*, § 2–204:11 at 204 (1982).

"For at least a century the objective theory of contracts has been dominant." The "subjective" theory of intent is now regarded as irrelevant. "The objective theory lays stress on the outward manifestation of assent made to the other party in contrast to the older idea that a contract was a true 'meeting of the minds.'" *J. Calamari, supra, Contracts* at 23. What a person may have intended subjectively is not controlling. Missouri has followed this objective theory at least since *Brewington v. Mesker*, 51 Mo.App. 348, 356 (1892).

As stated by Professor Immel in 1 Mo.Bar CLE, *Civil Actions*, § 7.1 (1980):

> ... The intent with which we are concerned is the objective manifestation of intent by the parties, that is, what a reasonably prudent person would be led to believe from the actions and words of the parties. This is a question to be resolved by the [trier of fact].

See also *Embry v. Hargadine, McKittrick Dry Goods Co.*, 127 Mo.App. 383, 105 S.W. 777 (1907).

While a few cases under § 2–204 of the UCC speak in terms of "meeting of the minds," *First American Farms, Inc. v. Marden Mfg. Co.*, 255 So.2d 536 (Fla.App. 1971); *Lakeside Pump & Equipment, Inc. v. Austin Const. Co.*, 89 Wash.2d 839, 576 P.2d 392 (1978), the actual holdings are consistent with the theory of objective manifestation of assent. An actual mental reservation does not prevent a contract from being formed if there is a manifestation of assent and nothing in Section 2–204 changes this approach. 2 W. Hawkland, *UCC Series*, § 2–204:02 at 64 (1982); *Bradford v. Plains Cotton Cooperative Assn.*, 539 F.2d 1249, 1256 (10th Cir.1976).

Tested by these principles, there was, under the circumstances here, "mutual assent" to purchase twenty-one computers. Regardless of Chapman's intent to purchase a lesser number, the letter of February 23 explicitly contained that number. Although the trial court admitted testimony of Chapman, over objection of the parol evidence rule, that Purcell did not intend to purchase twenty-one computers, because it had only 15 stores, the trial court found mutual assent and that the contract called for the sale of twenty-one computers. Chapman acknowledged that he signed the letter containing that number; presumably he must have read the letter when it was presented to him. Having signed the letter, he is charged with knowledge of its contents. See 2 Anderson, *Uniform Commercial Code*, § 2–204:20; 67 Am.Jur.2d, *Sales*, § 226 at 449; *Crim v. Crim*, 162 Mo. 544, 63 S.W. 489, 491 (1901); 17 Am.Jur.2d, *Contracts*, § 149 (1964). He admitted he signed the letter; he admitted that he could have changed the letter if he desired to do so but did not. A mere change could have effected a lesser number.

As stated in *Shofler v. Jordan*, 284 S.W. 2d 612, 615 (Mo.App.1955):

> [The essentials] to formation of a contract may not be found or determined on the undisclosed assumption or secret surmise of either party but must be gathered from the intention of the parties as expressed or manifested by their words or acts.

Under these circumstances, the objective manifestation of mutual assent is present; the trial court so concluded and in this respect the court did not err.

Our conclusion is consistent with authorities in other states. There is authority to the effect that a contract was formed under similar circumstances. *Chicopee Concrete v. Hart Engineering*, 20 Mass.App.

315, 479 N.E.2d 748 (1985) (letter confirming intention to award purchase order for concrete mixes); *Carolina Builders Corp. v. Howard–Veasey, supra,* 324 S.E.2d 626 (building materials); *Blair Intern., Ltd. v. LaBarge, Inc.,* 675 F.2d 954 (8th Cir.1982) (contract for letter of credit).[2]

## VI.

Appellant next contends that the February 23 letter was ambiguous and incomplete so that no contract was made. This contention was rejected by the trial court and we affirm that finding.

Appellant attempts to make much of the fact that there were so many omissions and ambiguities in the letter that no agreement was formed.

▮ It is fundamental that in order to be binding an agreement must be definite and certain as to its terms and requirements to enable a court to determine its meaning and to measure the extent of the promisor's liability. *Bengimina v. Allen, supra,* 375 S.W.2d at 203; *Ogilvie v. Ogilvie,* 487 S.W.2d 40, 41 (Mo.App.1972); 17 Am.Jur.2d, *Contracts,* § 75 at 413 (1964). This general principle is applicable to agreements for the sale of goods and it is elementary that the goods must be so described or designated in the agreement. See 67 Am.Jur.2d., *Sales,* § 115 at 382 (1985). But there is no need to state each and every detail and every fact to which the parties may be agreeing. A contract should not be held void for uncertainty unless there is no possibility of giving meaning to the agreement. Professor Corbin recognizes this principle by stating:

A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding.

\* \* \* \* \* \*

In considering expressions of agreement, the court must not hold the parties to some impossible, or ideal, or unusual standard. It must take language as it is and people as they are. All agreements have some degree of indefiniteness and some degree of uncertainty. In spite of its defects, language renders a practical service. In spite of ignorance as to language they speak and write, with resulting error and misunderstanding, people must be held to the promises they make. The court must not be overly fearful of error; it must not be pedantic or meticulous in interpretation of expressions.

1 A. Corbin, *Contracts,* § 95 at 394–396 (1963).

▮ These general contract principles are applicable to the Uniform Commercial Code. Under the UCC, there is no requirement to detail all of the terms in order for there to be a binding agreement for the sale of goods. Under the UCC, even though there are missing terms, a contract still exists, provided that there exists a reasonably certain basis for giving an appropriate remedy. Section 2–204(3). One of the essential elements is the quantity term, but even that term is sufficiently definite to provide a reasonable basis for granting relief, if it may be determined from other factors. "The price term is not critical for giving an appropriate remedy and neither are such terms as 'delivery,' 'payment,' 'warranty,' 'risk of loss,' or 'choice of law.'" 2 Hawkland, *UCC Series* at 67; cf., *Sedmak v. Charlie's Chevrolet, Inc., supra,* 622 S.W.2d at 697.

▮ Under the UCC, the ultimate test of definiteness with respect to the sale of goods is that there be a reasonably certain basis for giving an appropriate remedy. Official Comment to § 2–204. The fact

**2.** In several decisions which are clearly distinguishable from the case at bar, no agreement or contract was found to exist. *D.R. Curtis Co. v. Mason, supra,* 649 P.2d 1232 (trial court found no agreement to sell wheat—mere exploration of possibility); *Bethlehem Steel Corp. v. Litton Industries, Inc., supra,* 468 A.2d 748; (absence of essential terms); *American Web Press, Inc. v. Harris Corp., supra,* 596 F.Supp. 1089 (memo only offer); *Flowers Baking Co. v. R.P. Packaging, Inc.,* 329 S.E.2d 462 (Va.1985) (words and conduct merely tentative); *Euclid Engineering Corp. v. Illinois Power Co., supra,* 223 N.E.2d 409.

that a contract for the sale of goods may be open does not void the contract if it can be ascertained from the express or implied provisions. Cf., *Allied Disposal, Inc. v. Bob's Home Service, Inc.*, 595 S.W.2d 417, 421 (Mo.App.1980).

Section 400.2–204(3) requires only that, even though one or more of the terms are left open, a contract does not fail if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. See 67 Am. Jur.2d, *Sales*, §§ 117, 118 (1985); Official Code Comment; *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409 (N.D.Ohio 1976) disapproved on other grounds, *Barnes Group Inc. v. C & C Products, Inc.*, 716 F.2d 1023 (4th Cir.1983); *Southern Utilities, Inc. v. Jerry Mandel Machinery Corp.*, 71 N.C.App. 188, 321 S.E.2d 508 (1984); *Murphy v. Holliway*, 223 Mo. App. 714, 16 S.W.2d 107 (Mo.App.1929).

Recently we had occasion to consider the definiteness of a price term in an agreement in *Sedmak v. Charlie's Chevrolet, Inc., supra*, 622 S.W.2d at 694. There we said that "[f]ailure to specify the selling price in dollars and cents did not render the contract void or voidable ... As long as the parties agreed to a method by which the price was to be determined and as long as the price could be ascertained at the time of performance, the price requirement for a valid and enforceable contract was satisfied." *Sedmak v. Charlie's Chevrolet, Inc., supra*, 622 at 697; also holding that the "quantity" term is a "key provision without which the court cannot reconstruct the contract fairly."

In *Allied Disposal v. Bob's Home Service*, 595 S.W.2d 417 (Mo.App.1980), we held that an "agreement to agree" on price does not preclude the validity of a contract. While we recognized the general rule that an agreement must fix a price or privide a method to ascertain the price in order to form an enforceable contract, we also recognized that where there is no statement at all as to price and the contract has been executed, the law implies a standard of reasonableness. We noted the fact that earlier cases in Missouri on vagueness and indefiniteness have been largely rendered obsolete by the enactment of the Uniform Commercial Code as it pertains to the sale of goods.

In the case at bar, the letter of February 23, 1984 contains all the material and essential terms for a binding agreement. The parties, Brown and Chapman, signed the letter "regarding the purchase" by Purcell of "twenty-one (21) IBM PC's over the next twelve (12) months." The price was established in the letter with certainty. The fact that the seller reduced the price in some instances following the delivery and payment of the first two computers does not make the contract ambiguous so as to be unenforceable. The long list of omissions suggested by Purcell— ranging from the lack of a total price in the "letter," and which party is to deliver the computers, to no mention of liquidated damages—does not show that the contract is ambiguous as to be void. Furthermore, there is no requirement to detail and list all the previous conversations in the letter.

Under all the circumstances, we conclude that the trial court did not err in finding that the contract for the sale of computers was not indefinite.

## VII.

Appellant also complains that parol evidence, while not admissible to vary or alter the terms of a valid contract, is admissible to show that no contract was made. *City–Wide Asphalt Co., Inc. v. E.E. Scott Const. Co., Inc.*, 610 S.W.2d 330, 336 (Mo. App.1980).

Although § 400.2–202, embodies the parol evidence rule, prohibiting the introduction of evidence to vary or alter the terms of the final expression of the agreement, the trial court admitted testimony of the conversations prior to the signing of the February 23, letter. This evidence was admitted and was disbelieved by the trial court. We find no error.

## VIII

Lastly, appellant contends that the trial court failed to consider the "practical con-

struction" of the letter which tended to show that Purcell did not intend to purchase twenty-one computers, and to show that some computers were delivered at various prices which did not conform to the price stated in the letter.

Section 400.2–208 of the Code provides:

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

■ Purcell emphasizes this section to show that the parties course of performance showed that the computers, after the delivery of the first two, fluctuated in price and the price was not consistent with the price stated in the letter. However, this was explained by testimony involving the delivery of a different printer and by the fact that prices were reduced so that plaintiff, retaining a co stant profit, reduced the price of some of the nine delivered to the benefit of Purcell. Of more significance under the "practical construction" provision is the course of performance accepted and acquiesced in by Purcell to determine the meaning of the contract. Purcell accepted nine separate computers and paid for them promptly. This action indicates that it contracted for the computers, despite Chapman's subjective intention that he thought Purcell was only purchasing a number less than twenty-one.

The numerous decisions relied upon by appellant state the general principles but are not controlling in the case at hand. *Village of Cairo v. Bodine Contracting Co.*, 685 S.W.2d 253, 265 (Mo.App.1985); *Aetna Casualty & Surety Co. v. Haas*, 422 S.W.2d 316, 320 (Mo.1968); *Laclede Construction Co. v. T.J. Moss Tie Co.*, 185 Mo. 251, 84 S.W. 76, 91 (1904); ("Tell me what you have done under a deed, and I will tell you what the deed means.")

This contention made by appellant is without merit.

IX.

In sum, we hold that the trial court correctly ruled that there was a valid and binding contract between the parties for the purchase of twenty-one IBM PC computers, that the contract was not ambiguous, that the trial court did fully consider whether there was an objective manifestation of consent to enter into a contract, and did consider Mr. Chapman's intention to purchase computers for the number of stores owned by Purcell. Under the test mandated by *Murphy v. Carron, supra,* we find that the judgment is supported by substantial evidence, is not contrary to the weight of the evidence and does not erroneously apply or declare the law.

The judgment is affirmed.

SATZ, C.J. and CARL R. GAERTNER, J., concur.